UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**NOT FOR PUBLICATION**

-------------------------------------------------------------X

SHRED-IT USA, INC.,

                Plaintiff,

        -against-

CONFIDENTIAL SHREDDING, LLC,
JOSEPH VILLANI and JOSEPH DAVID,

            Defendants.

-------------------------------------------------------------X

03-CV-1816 (ERK)(MDG)

<u>MEMORANDUM & ORDER</u>

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN 1 5 20.. ★

P.M.
TIME A.M. _____

KORMAN, Chief Judge.

     Defendants Joseph Villani ("Villani") and Joseph David ("David") are former employees of plaintiff Shred-it USA, Inc. ("Shred-it"). Villani and David founded defendant company Confidential Shredding, LLC ("CS") while still employed at Shred-it, and several months later quit their jobs at Shred-it in order to commence running CS. Plaintiff sued Villani, David and CS seeking damages, along with preliminary and permanent injunctive relief, under eight separate causes of action: breach of restrictive covenant, misappropriation of trade secrets, interference with business relationships and contracts, breach of the duty of loyalty, breach of fiduciary duties, conversion and unjust enrichment. Plaintiff's motion for a preliminary injunction was denied on July 16, 2004, after a hearing before the Honorable Marilyn D. Go on June 12, 2003.

     On November 19, 2004, defendants filed their first motion for summary judgment. At the time, plaintiff also moved for summary judgment on defendants' counterclaim, which alleged that plaintiff commenced suit with the sole purpose of interfering with defendants' business relations.

1

By order dated February 9, 2005, I granted the motion for summary judgment on the counterclaim in favor of the plaintiff, and granted the defendants' motion for summary judgment in favor of defendants with respect to plaintiff's second, fourth, sixth, and eighth causes of action. The order denied summary judgment on the remaining counts: (1) breach of contract; (3) misappropriation of trade secrets; (5) breach of the duty of loyalty; and (7) breach of fiduciary duty; and (9) permanent injunctive relief.

On April 20, 2005, defendants filed their second motion for summary judgment, essentially seeking to dismiss all of these remaining counts on two alternative grounds. Defendants also asked to dismiss plaintiff's claims of injury and loss arising out of defendants' actions in New Jersey and/or Connecticut. Finally, defendants alternatively asked for permission to file an amended answer.

Because my initial order contained a lengthy and detailed background section, I now repeat that section.

## BACKGROUND

The following facts draw upon the preliminary injunction hearing, along with various depositions, interrogatories, and the parties' 56.1 statements. These facts are undisputed, except where as noted.

### Plaintiff Shred-it

Shred-it is an international mobile document shredding business. Shred-it dispatches trucks to client locations to either shred documents on-site or carry documents away for off-site destruction. Shred-it operates through various branches located throughout the United States, Canada and Europe.

Some of these branches are owned by Shred-it, while the remainder are franchise operations, which pay royalties and management fees to Shred-it. Each Shred-it branch establishes its own prices and truck routing. The various branches each service their respective regions; they do not compete with each other.

The corporate and franchise branches work together to provide a seamless system to service customers with multiple locations and so-called "national accounts," large customers with shredding needs located across the country. When pitching a potential new customer, a Shred-it sales representative will tout Shred-it's ability to service all of that customer's shredding needs. If one Shred-it branch acquires business from a customer with multiple locations, that branch will send sales leads to Shred-it branches that service areas in which the new customer is also located.

Relevant to the instant action are Shred-it's corporate branches in New York City, White Plains and Philadelphia, and franchise branches in New Jersey and Connecticut.

### Defendants David and Villani

David and Villani are both former employees of Shred-it's New York City branch. David was hired to be the branch's general manager in November 2000. In this role, David oversaw the hiring and firing of employees, the management of customer relationships, the routing of trucks and the pricing decisions. David later hired Villani as the branch's sales supervisor. David quit his position on March 10, 2003, and Villani quit his position one day later.

### The Restrictive Covenants

While at Shred-it, David and Villani each signed identical restrictive covenants. These

3

restrictive covenants bound the specified employee and "Shred-it, Inc." — referred to as the "Company" throughout the covenant. By signing the restrictive covenant, David and Villani promised to abide by five restrictions. First, David and Villani promised not to disclose any "Confidential Business Information" to any third party during the course of their employment with the "Company." The restrictive covenant defines "Confidential Business Information" as "confidential information and trade secrets including, but not limited to: customer information, supplier information, route maps, marketing methods, potential prospect information, training methods, software, financial information and other confidential data."

The remaining four restrictions apply to both the duration of David and Villani's employment and the period after employment termination. Under the restrictive covenant, David and Villani agreed to not:

(A) "Directly or indirectly compete with Company in any mobile document destruction business in the service area of New York City [the term 'New York City' was handwritten on a blank line] for a period of one year following the date" of employment termination;

(B) "Solicit any such customer or prospective customer whom Employee came to know by virtue of Employee's employment with Company for a period of one year following the date employment ends;"

(C) "Undertake any employment or activity in the mobile document destruction business in which the loyal and complete fulfillment of the duties of the employment or activity would call Employee to reveal, make judgments on, or otherwise use any Confidential Business Information to which Employee was given while employed by Company;" or

(D) "Disclose to any third party the Confidential Business Information or trade secrets of Company."

Shred-it no longer uses this version of its restrictive covenant. Currently, Shred-it New York City requires its employees to sign a restrictive covenant that prevents former employees from

4

competing against Shred-it within a seventy-five mile radius of Shred-it New York City for eighteen months after employment termination. Plaintiff contends that David should have signed this new version when he was asked by Shred-it to sign a second restrictive covenant on May 13, 2002 – in addition to the restrictive covenant he signed upon commencing his employment at Shred-it.

The first employee to sign this new version did so in January 2002, when he commenced employment with Shred-it. Another employee signed this new version in February 2002. The evidence shows that the next time any employee signed this new version occurred in June 2002. It is unclear whether Shred-it New York City did not hire other employees in the interim, or whether employees were asked to sign the former version.

David was the person in charge of assuring that employees signed a restrictive covenant. He testified that when he signed the old version in May 2002, he thought that the new form was only for new employees. As such, he printed off a copy of the old form from his computer and submitted it to personnel. He also stated that he would not have signed the new version because he found the restriction on future competition to be "ridiculous." Further, David testified that he showed his lawyer a copy of the restrictive covenant before he signed it. He said that he was thinking about starting CS at "around" that time, but could not remember whether he was thinking about starting CS when he consulted his lawyer and signed the form.

## *Defendants' Access to Potentially Confidential Shred-it Information*

Defendants David and Villani had access to five sources of potentially confidential information: (1) Shred-it's ShredCom database; (2) Shred-it's Tri-State Sales Summits; (3) Shred-it's employee training sessions; (4) a competitor analysis prepared for David and Villani prior to their

5

departure from Shred-it; and (5) Shred-it documents that David emailed from his work account to his personal account.

## 1. The ShredCom Database

David had a computer in his office which had access to Shred-it's "ShredCom" database. This database contained a complete list of the New York City branch customers. For each customer, the ShredCom database contained the price paid by the customer, the customer's billing history and the appropriate contact information for that customer. The database also specified whether the customer would call Shred-it whenever it desired shredding services, or whether the customer was on an "automatic" schedule, and the frequency of service for such customers. The database also contained all of Shred-it's trucking routes in New York City.

While David could only access New York City customer information on the ShredCom database, he did have access to information on national accounts that used the New York City branch. David also admitted that he knew the names of some Shred-it customers who used other branches. However, David testified that he did not take any customer lists with him when he left Shred-It in March 2000. He also stated that CS has acquired all of its customers from calling upon businesses listed on the internet.

Villani testified that the information on the ShredCom database is not "confidential information" and would provide competitors very little value. However, access to the database was password protected for at least part of the time during which David and Villani worked for the company. Moreover, when Villani testified on Shred-it's behalf in a previous lawsuit to enforce a restrictive covenant, Villani stated that the information in the ShredCom database was "priceless."

6

He explained that Shred-it expended significant costs in developing its customer lists. When asked to reconcile his earlier position with his current position, Villani explained that the passage of the Health in Patient Privacy Act ("HIPAA") and the growing awareness of the need for document destruction (e.g. television commercials depicting identity thieves combing through garbage) have greatly expanded the market for shredding services.

David had also taken inconsistent positions with regard to the confidentiality of the ShredCom database. When David testified on Shred-it's behalf in a previous lawsuit to enforce a restrictive covenant, he stated that it is generally much easier to sell shredding services to customers who already use shredding services. In the instant action, David testified that this is only true when the current service provider is not providing good service. Like Villani, David explained his change in position on HIPAA and the growing awareness of the need for document destruction.

## 2. The Tri-State Sales Summits

Shred-it conducted two "Tri-State Sales Summits" during the course of David and Villani's employment. These meetings were held to help the various Connecticut, New York and New Jersey branches coordinate to share multi-location and national accounts. In attendance at the meetings were branch managers, sales supervisors, and regional managers.

Attendees at the November 2002 meeting received a presentation by Shred-it's national account manager. This presentation contained a breakdown of national accounts held by each branch. This breakdown contained customer information organized by branch, including revenue, frequency of service, and the appropriate client contact information. The presentation also contained a list of each branch's top customers, along with the same customer detail. Additionally, the

7

presentation contained a list of prospective customers for the various Shred-it branches.

Both David and Villani were invited to attend these meetings. However, under advice of their own personal counsel, David and Villani chose to not attend these meetings. Instead, they sent Christian Smeets, the most senior sales representative in the Shred-it New York City branch. At the November 2002 meeting, Smeets received the presentation described above. Smeets testified that when he returned to the New York City branch office, he placed this presentation and other information obtained at the meeting on Villani's desk chair. According to Smeets, Villani returned these materials to Smeets a few days to one week later. Villani placed the information on Smeet's desk with a note instructing him that he did not want to see any materials from any Tri-State Sales Summits. Smeets also received an email instructing him not to share information from any Tri-State Sales Summits with either Villani or David. Smeets then complied with this request.

Villani disagrees with Smeets's characterization of the events described above. According to Villani, Smeets left information from the November 2002 meeting on David's desk. Villani saw the materials on David's desk and returned them to Smeets immediately, without ever looking at them. Villani explicitly disputes Smeets's position that Villani possessed the materials for one week. Further, David testified that he is not sure whether Smeets made the materials available to him. Both David and Villani state that they never examined any materials from any Tri-State Sales Summits.

### 3. Training

When Villani had testified on Shred-it's behalf in prior litigation, he had stated that sales representatives receive significant training on Shred-it's unique pricing and selling methodologies. For example, he explained that Shred-it's sales representatives are taught special techniques on how

to close a deal and how to avoid the "gatekeeper" who ordinarily blocks access to the individual at a potential client who has the ability to contract with Shred-it. Villani retracted this earlier position when he testified in the instant litigation. He explained that due to the changes in the industry discussed above, neither Shred-it's pricing nor its sales techniques are unique. Villani also testified that CS does not use Shred-it's system of either pricing or selling.

### 4. Competitor Analysis

Christian Smeets, the senior sales representative who attended the Tri-State Sales Summits, provided David and Villani with a comprehensive competitor analysis on February 10, 2003 – one month prior to defendants' departure from Shred-it. Smeets performed the analysis after conversing with David and Villani about competitive threats to Shred-it. Smeets had initiated the conversation and had suggested that he conduct the analysis. David and Villani agreed that the analysis would be a helpful tool.

### 5. David's Email

Prior to quitting his job at Shred-it, David emailed Shred-it document from his work email account to his personal email account. These documents contained Shred-it financial information (e.g. profit and loss statements) and overall Shred-it performance overviews. David testified that he sent such documents to himself frequently throughout his employment at Shred-it so that he could work from home instead of spending late nights at the office.

## Defendant CS

David and Villani took steps to commence running CS prior to their departure from Shred-it in March 2003. In September 2002, they registered CS as a New Jersey limited liability company. David and Villani designed and printed business cards and marketing materials for CS, but did not send any out until they left Shred-it's employ. David and Villani also purchased a shredding truck in February 2003, which they started looking for in December 2002.

David and Villani quit their positions at Shred-it on March 10, 2003 and March 11, 2003, respectively. On March 12, 2003, David became CS's President and Operations Manager, and Villani became CS's Secretary-Treasurer and Sales Manager. David and Villani still hold these positions.

When CS first officially commenced operations in March 2003, David and Villani were the only employees. CS operated only one shredding truck – a single speed truck, which differed from Shred-it's variable speed trucks. CS operated out of New Jersey and served clients located in both Connecticut and New Jersey. David and Villani, through CS, did not attempt to compete anywhere in New York State due to their restrictive covenants with Shred-it. David and Villani waited until one year had passed from the time they quit Shred-it before they did began to compete in New York. David and Villani thought that this strategy would avoid any litigation brought by Shred-it.

In the first month of operations, CS acquired a few accounts from the Connecticut and New Jersey Shred-it branches. David and Villani explained that CS did not intentionally solicit Shred-it clients and had acquired these accounts by coincidence. According to defendants, CS solicited potential customers based upon a list generated through internet research, and some of these companies just happened to use Shred-it. Moreover, according to David, CS deliberately avoided

soliciting Shred-it's national accounts.

Soon after CS commenced operations, Shred-it's New Jersey franchise branch commenced suit against CS. The two parties settled with an agreement that CS would only solicit a certain percentage of Shred-it New Jersey's clients. A similar settlement was reached after the Connecticut Shred-it franchise was about to commence suit.

CS now competes in New York, New Jersey and Connecticut. As of September 2004, CS operated two shredding trucks, employed one driver and used an independent contractor. Also as of this time, CS had obtained approximately 20 customers in the New York City, Long Island and Westchester Country regions. At least two of these customers had previously been serviced by Shred-it New York City.

Shred-it New York City cannot identify any other customers that it lost to CS. However, the parties have not had full discovery on this issue since both CS and Shred-it refuse to turn over their customer lists. Moreover, Villani admitted that he told some Shred-it customers who were switching to CS to lie to Shred-it about their decision to use CS. This factor would make it extremely difficult for Shred-it to identify customers lost to CS.

## DISCUSSION

### A. Standard for Motion for Summary Judgment

A motion for summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). Thus, the moving party has the burden of establishing that no material facts

11

are in dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). "The District Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463 (2d Cir. 1995). "In the context of a motion for summary judgment, 'factual allegations in the pleadings of the party opposing the motion ..., if supported by affidavits or other evidentiary material, should be regarded as true.'" *Rosen v. Spanierman*, 894 F.2d 28, 30 (2d Cir. 1990) (citing *Burtnieks v. City of New York*, 716 F.2d 982, 983-84 (2d Cir. 1983)). "Viewing the evidence produced in the light most favorable to the non-movant, if a rational trier could not find for the non-movant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir. 1991).

## B. Plaintiff's Procedural Challenge to Defendants' Motion

Before discussing the merits of the case, I first address plaintiff's argument that defendants' second summary judgment motion was procedurally improper. Generally, "piecemeal consideration of successive motions for summary judgment" is discouraged "because parties ought to be 'held to the requirement that they present their strongest case for summary judgment when the matter is first raised.'" Siemens Westinghouse Power Corp. v. Dick Corp., 219 F.R.D. 552, 554 (S.D.N.Y. 2004) (quoting Allstate Finance Corp. v. Zimmerman, 296 F.2d 797, 799 (5th Cir.1961)). However, a district court judge "certainly has discretion to review a successive summary judgment motion seeking precisely the same relief as before." Id. (citing Wechsler v. Hunt Health Sys., Ltd., 198 F.Supp.2d 508, 514 (S.D.N.Y.2002) ("A party may renew its motion for summary judgment as long as it is supported by new material.")).

Here, although defendants do not offer any new material in support of their motion for summary judgment, they do raise two new arguments. Although both of these arguments both could have and should have been made in defendants' first motion for summary judgment, I have decided to exercise my discretion to decide defendants' motion.

## C. Defendants' First Ground for Summary Judgment

Defendants first argue that plaintiff, "Shred-it USA, Inc." cannot pursue its contractual claims against plaintiff because plaintiff was not a party to the restrictive covenants signed by David and Villani. The defendants point out that the covenants bind "Shred-it, Inc.," and not "Shred-it USA, Inc."

I first note that this argument only supports summary judgment on the breach of contract claim. Second, "[u]nder New York law, a contract entered into by a corporation under a 'colloquial title' is enforceable by either party, and the 'misnomer is held unimportant.'" Spanierman Gallery, PSP v. Love, 320 F. Supp. 2d 108, 111 (S.D.N.Y. 2004) (quoting Mail & Express Co. v. Parker Axles, Inc., 204 A.D. 327, 198 N.Y.S. 20, 21 (1st Dep't 1923)). Here, plaintiff asserts that "'Shred-it, Inc.' is a shortened reference to the SHRED-IT® group of companies" and that "[t]here is not now, nor has there ever been a corporate entity known as "Shred-it, Inc." (Pl.'s Rule 56.1(b) Statement ¶ 2). Thus, if plaintiff is correct, and if I were to accept defendants' argument that only "Shred-it, Inc" could enforce the restrictive covenants, no entity could enforce the agreements against David and Villani. But New York law compels otherwise. See Spanierman, 320 F. Supp. 2d at 112. ("[I]t is beyond dispute that 'R.H. Love Galleries' was intended to designate defendant R.H. Love Galleries, *Inc.*")

Defendants attempt to distinguish cases such as <u>Spanierman</u>, explaining that in those cases, there was little chance that the party seeking to invalidate the contract might have confused the intended entity with another existing entity. See <u>id.</u> ("Importantly, Plaintiffs have not alleged that, at the time of the contract, they were under any actual misapprehension that there was some other, unincorporated groups with virtually the same name as R.H. Love Galleries, Inc."). Here, plaintiff admits to the existence of three incorporated "Shred-it" entities: (1) Shred-it USA, Inc. a Delaware corporation that owns and operates Shred-it's corporate branches in the United States – and the entity named in the restrictive covenants; (2) Shred-it Canada, Inc., a Canadian corporation that owns and operates Shred-it's corporate branches in Canada; and (3) Shred-it America, Inc., a Delaware corporation that operates Shred-it's franchise businesses. (Pl.'s Rule 56.1(b) Statement ¶ 2). However, it is difficult indeed for defendants to contend there was any real misapprehension as to the entity intended in the contracts they signed; defendants assert and plaintiff admits, "Shred-it USA, Inc. owns and operates the New York business, located at 18-20th Street, Brooklyn, Kings County, New York, which employed the individual Defendants in this case. (Defs.' Rule 56.1(a) Statement, ¶ 4; Pl.'s Rule 56.1(b) Statement, ¶ 4). For these reasons, defendants' motion for summary judgment based on the claim that plaintiff was not a party to the restrictive covenants is denied.

## D. Defendants' Second Ground for Summary Judgment

Defendants second, alternative ground for summary judgment is that if plaintiff was a party to the restrictive covenants, the covenants themselves are a bar to plaintiff's lawsuit. Defendants cite to the fourth paragraph of the restrictive covenants, which provides that:

If, at any time within one (1) year after the termination of Employee's employment with Company, Employee directly or indirectly solicits or provides services, which Company provides, to any customer of Company, Employee, in lieu of the Company's exercising any other remedy provided for herein, may purchase from Company the business and goodwill associated with such customer. Such purchase shall be memorialized in a writing no later than 30 days after the Company is informed that Employee has solicited or provided service to any Company customer.

The fourth paragraph continues on to provide a methodology for calculating goodwill and the terms of a payment installment plan. The paragraph concludes:

This provision, if agreed to by the Employee, shall be deemed a waiver of any other rights the Company may have against the Employee for breach of this Agreement or for any injunctive relief.

Defendants contend that, because "the Company" has not made demand for payment in accordance with the fourth paragraph, the defendants have not had the opportunity to decline to exercise their rights under the fourth paragraph. The defendants argue that unless they are given the opportunity to purchase the business and goodwill of the companies they allegedly serviced and/or solicited, and unless they then decline to do so, Shred-it cannot seek recourse in the instant action for any of its causes of action. This interpretation is faulty. The fourth paragraph does not say that defendants must be given the opportunity to decline to purchase the business taken from Shred-it. The provision merely says that the Employee may purchase the business within 30 days of the time the Company receives notice of the service and/or solicitation of the former Shred-it client.

Moreover, this argument ignores the first sentence of the fourth paragraph, which arguably limits the application of that paragraph to breaches of the restrictive covenant involving the servicing and/or solicitation of Shred-it customers. Essentially, defendants' interpretation of the fourth paragraph is that as long as the employee breached the restrictive covenant by servicing and/or soliciting Shred-it customers, even if that employee also misappropriated trade secrets, and/or

15

breached his fiduciary duty to Shred-it, and/or breached his duty of loyalty to Shred-it, if that employee then purchased the business pursuant to the fourth paragraph, the last sentence of that paragraph precludes Shred-it from pursuing "any other rights the Company may have against the Employee."

This interpretation hardly seems plausible. The far more likely interpretation of the fourth paragraph is that the waiver intended by its final sentence only concerns the breaches of the restrictive covenant described in the first sentence of the paragraph: the servicing and/or solicitation of Shred-it customers. Further, even though defendants cite to cases which generally stand for the proposition that a party to a contract must exhaust his remedies under the contract before invoking the jurisdiction of the courts, the tenth paragraph of the restrictive covenant specifies that "[i]t is expressly agreed that Company may affirmatively exercise its rights to file an action in any court of competition jurisdiction." Thus, at most, the fourth paragraph could be used to justify a grant of summary judgment on plaintiff's breach of contract claim – but only with respect to the breaches concerning the servicing and/or solicitation of Shred-it customers. Plaintiff also alleges that defendants breached their restrictive covenants by using Shred-it's confidential information to benefit CS.

Yet, even with respect to plaintiff's allegations that defendants breached the restrictive covenants by servicing and/or soliciting Shred-it customers, summary judgment is not appropriate. This is so because plaintiff has claimed that defendants unilaterally altered the restrictive covenants they signed. Plaintiff has presented restrictive covenants signed by thirteen other Shred-it employees which have a slightly different fourth paragraph. (Aff. of Mike Sheehan in Opp. to Defs.' Second

16

Mot. for Summ. J. ¶¶ 1-6, Exh. A). The key differences are as follows, with the differences italicized.

| Difference | Covenant signed by 13 employees | Covenant signed by David and Villani |
|---|---|---|
| Waiver of other remedies | If ... Employee directly or indirectly solicits or provides services ... Employee shall immediately purchase from the Company the business and goodwill associated with such customer ... This provision *shall not be deemed a waiver* of any rights of the Company against the Employee for breach of this Agreement or for any injunctive relief... | If ... Employee directly or indirectly solicits or provides services ... Employee, *in lieu of the Company's exercising any other remedy provided for herein, may* purchase form Company the business and goodwill associated with such customer ... This provision, if agreed to by the Employee, *shall be deemed a waiver* of any other rights the Company may have against the Employee for breach of this Agreement or for any injunctive relief. |
| Calculation of goodwill | It is hereby agreed that the price of said goodwill shall be measured by *three (3) times* the annual billing by Company and/or its employees in servicing such customer during the 12-month period immediately preceding the date of termination *but in no event, less than ten thousand dollars ($10,000.00) for each such customer.* | It is hereby agreed that the price of said goodwill shall be *one half* the annual billing by Company and/or its employees in servicing such customer during the 12-month period immediately preceding the date of termination. |

In their reply brief, defendants responded to plaintiff's allegation that defendants unilaterally altered their restrictive covenants. They wrote:

> Lest there be any mistake, the Defendants deny any nefarious, fraudulent, improper or misleading conduct on their parts. Plaintiff provided Defendants with form non-competition agreements. The Defendants did not like them. They absolutely refused to sign the form containing an enhanced non-compete provision covering a 75 mile radius for 18 months. Neither did they like the remedies provision of the older form. They modified the second contract document, executed it and returned it to the SHRED-IT™ offices in Toronto, Canada. Plaintiff's problem is that it did not bother to read the contract before it accepted it.

17

(Defs.' Reply Mem. 6-7 n.3). Most likely, plaintiff "did not bother to read the contract" because defendants modified it by using a computer to alter the "form non-competition agreements," rather than by making their changes on the face of the contract manually. More significantly, plaintiff probably "did not bother to read the contract" because defendant David was the Shred-it employee in charge of executing the restrictive covenants. As David testified during the preliminary injunction hearing:

> Q.    As the general manager of Shred-it's New York office, you were responsible for maintaining personnel files for your employees, correct, sir?
> A.    Myself and the human resource defendant at corporate. I was responsible for sending them up to them also.
> Q.    You were the person in charge of having your employees sign noncompete forms, right?
> A.    For the most part, yes.

Inj. Tr. at 19:13-15.

Here, David, the Shred-it employee in charge of executing the restrictive covenants, altered the standard form signed by the other employees, and did so in a way that would not be obvious to the employee at Shred-it's corporate headquarters who received the form. This corporate employee had absolutely no reason to suspect that David and Villani altered the standard forms which they were supposed to sign; there was no reason to suspect David's disloyalty to Shred-it and his intentional failure to perform his job properly.

Under New York law, "a contract may be reformed if there is mutual mistake or a mistake by one party coupled with fraud or inequitable conduct of the other party." John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co., 717 F.2d 664, 671 (2d Cir. 1983) (citing Brandwein v. Provident Mut. Life Ins. Co., 3 N.Y.2d 491, 496 (1957)). Here, given plaintiff's mistaken belief that the standard form restrictive covenant provided to David and Villani had not been altered, coupled

with David and Villani's fraudulent and inequitable conduct in altering their restrictive covenants, strongly suggests that the restrictive covenants should be reformed to reflect the contract that plaintiff initially asked defendants to sign.

Defendants' citation to <u>John Hancock Mutual Life Insurance Co. v. Carolina Power & Light Co.</u>, 717 F.2d at 671 is wholly unavailing. In this case, the Second Circuit declined to reform a contract where "[plaintiff] received the [contract] and should have been aware of the provisions for special redemptions after a thorough reading of the contract ... There is simply no evidence of deception, fraud, or inequitable conduct on the part of [defendant]." <u>Id.</u> Here, as discussed above, David and Villani's conduct was deceptive, fraudulent and inequitable, and, even if plaintiff should have thoroughly read the standard restrictive covenant it provided to all its employees, it was David's job to do so.

However, it is not necessary to decide the reformation issue at this time. Reformation is only at issue if plaintiff is able to demonstrate that defendants breached the terms of the restrictive covenant. The mere possibility of reformation, however, precludes a grant of summary judgment.

## E. Defendant's Request to Limit Damages

Defendants also seek to limit the damages they may have to pay. They assert that plaintiff is barred from pursuing any claims based on any injury or loss in New Jersey and/or Connecticut. I do not address this argument because it is premature.

## G. Defendant's Request to Amend their Answer

Defendants also request leave to amend their answer if their motion for summary judgment

is denied. Although Federal Rule of Civil Procedure 15(a) provides that "leave shall be freely given when justice so requires," I deny defendants' request here because it is futile. See Foman v. Davis, 371 U.S. 178, 182 (1962). Defendants' new affirmative defenses have been addressed and denied in the instant motion. Moreover, defendants now seek to deny facts to which they previously admitted. For example, David seeks to amend the answer to deny that he was the general manager of the New York Shred-it branch (Amended Answer ¶¶ 9, 13), but at the hearing for the preliminary injunction, David testified as follows:

> Q. The case that you testified for Shred-it in the past was when you were the general manager of Shred-it's New York branch; is that right, sir?
>
> A. New York City branch.

(Inj. Tr. at 8:1:4). Similarly, Villani seeks to amend the answer to deny that he was the sales supervisor of the New York Shred-it branch (Amended Answer ¶¶ 10, 14), but in his affidavit in support of the instant motion, Villani avered that "I was employed by Shred-it USA, Inc. as the Sales Supervisor of its New York City branch Office." (Villani Aff. ¶ 3). True, the complaint refers to the New York City Shred-it branch as the New York branch, but defendants raise no legal argument concerning the distinction, rendering the proposed amendments futile.

Further, leave to amend should not be granted where there is "undue delay, bad faith or dilatory motive on the part of the movant, ... [or] undue prejudice to the opposing party by virtue of allowance of the amendment. Foman, 371 U.S. at 182. Here, defendants have had ample opportunity to amend their answer. This case is nearly ready for trial, and summary judgment has been considered not only once, but now twice. Any further delay caused by granting defendants

leave to amend their answer would cause plaintiffs undue delay. For these reasons, defendants' request for leave to amend is denied.

## CONCLUSION

The motion for summary judgment is denied in its entirety and defendants are denied leave to amend their answer. Moreover, on a personal note, I believe that this is a matter which can be and should be settled. I would be willing to meet with the parties to facilitate settlement, or appoint a mediator to do so at the parties' request.

**SO ORDERED:**

Dated: June ⏌, 2005
Brooklyn, New York

s/Edward R. Korman
Edward R. Korman
United States District Judge